IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| WAGDY ESKANDER | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:04-CV-541-Y |
| | § | |
| THE TITAN CORPORATION | § | |

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Pending before the Court is defendant The Titan Corporation's motion for summary judgment [doc. # 55], filed October 14, 2005.  After consideration of the motion, the response, and the reply, the Court GRANTS the motion.

I. BACKGROUND

Titan contracted with the United States Army to provide the Army with linguists who would supply foreign-language interpretation and translation services in support of the Army's operations in the Persian Gulf.  (Def.'s App. at 139.)  Because of obvious security issues, the Army dictated standards for Titan to follow for the recruiting, interviewing, testing, processing, and hiring of linguists for the positions.  (Def.'s App. at 139-40.)  The Army created three categories of linguists with differing levels of security clearances.  Category one contract linguists did not require a security clearance, category two linguists required a secret security clearance, and category three linguists required a top-secret security clearance.  Both category two and three linguists were required to be United States citizens.  The citizenship requirement is necessary because those linguists have access to classified information, which has the potential to damage the United States' national security if disclosed to foreign nationals.  (Def.'s App. at 140-41.)

Initially, the Army told Titan that a dual-citizen[1] applicant was not subject to automatic disqualification from category two or three positions if (1) his foreign passport expired or (2) the applicant prepared a letter to the issuing foreign embassy in which he returned his passport, renounced his foreign citizenship, and gave Titan evidence of the correspondence. (Def.'s App. at 20, 124, 141.) Later in April 2004, the Army modified the dual-citizenship mandates to provide that dual-citizens could become qualified for category two or three positions if (1) the applicant's foreign passport expired or (2) he obtained a letter from the foreign embassy stating that he had renounced his foreign citizenship and he had submitted that letter to Titan. (Def.'s App. at 36, 124, 141.)

In January 2004, plaintiff Wagdy Eskander applied for a category-two linguist position with Titan. At the time, he possessed a valid Egyptian passport and was a dual citizen of Egypt and the United States.[2] (Def.'s App. at 8, 10, 18.) Bob Woodhouse, a Titan recruiter, initially interviewed Eskander over the phone and told him that he would have to pass a security clearance, pass a language test, and surrender his Egyptian passport or wait until it expired. (Def.'s App. at 18-21.) Woodhouse told Eskander that he would have to either return his Egyptian passport to the Egyptian embassy or send Woodhouse a copy of his expired Egyptian passport. (Def.'s App. at 19.) Eskander passed the language test. (Pl.'s App. at 14.) Two days later, Woodhouse sent Eskander a security-clearance questionnaire, an application, personal information forms, and a document that stated "[i]f your Foreign Passport is not expired, you will need to Renounce it and mail us the confirmation that you have renounced your citizenship[;] otherwise you will be disqualified."

---

[1]A dual citizen is someone who possesses two valid passports. (Def.'s App. at 117.)

[2]Eskander was born in Egypt, but became a naturalized citizen of the United States in December 2003. (Def.'s App. at 245.)

(Def.'s App. at 45, 91.)  Eskander completed and returned the forms on January 14.  (Def.'s App. at 71-107.)

In February and March, Woodhouse and Eskander had phone conversations about the status of Eskander's application.  (Def.'s App. at 28-29.)  On March 16, Eskander sent a letter to the Egyptian embassy stating that he "would like to return [his Egyptian passport] to the consulate." (Def.'s App. at 67.)  In late March, Woodhouse arranged for Eskander to fly to Virginia for a required prescreening interview with the Army and Titan.  (Def.'s App. at 12-13.)  At Woodhouse's request,  Eskander sent him a copy of the March 16 letter.  (Def.'s App. at 31.)  Woodhouse and his supervisor questioned whether the language Eskander used in his letter was sufficient to renounce his Egyptian citizenship as required by the Army.  (Def.'s App. at 116.)  Titan decided to postpone Eskander's trip to Virginia.  (Def.'s App. at 113.)

After the Army modified its dual-citizen requirements in April 2004 and "several days" after the late-March conversation, Woodhouse contacted Eskander and asked him to write another letter to the Egyptian embassy to clearly indicate that he was renouncing his Egyptian citizenship. (Def.'s App. at 121-22.)  Woodhouse told Eskander about the modified requirement that he had to obtain a confirmation letter from the Egyptian embassy confirming that Eskander had renounced his citizenship.  (Def.'s App. at 137.)  Eskander states that this was the first time he knew he had to actually renounce his Egyptian citizenship.  (Def.'s App. at 34.)  Woodhouse helped Eskander draft a second letter, which stated "I would like to make it clear that I am renouncing my citizenship with the return of this passport."  (Def.'s App. at 34-36, 70, 134.)  Although Eskander gave Woodhouse the impression that he would send the second letter, he never did.  (Def.'s App. at 50.)  Further, he sent Woodhouse a copy of the second letter with a postal receipt.  (Def.'s App. at 66-70.)  The

attached receipt was not for the second letter but for a letter Eskander sent to the Egyptian embassy regarding how he could obtain an Egyptian birth certificate for his son.  (Def.'s App. at 47, 50.) Eskander was never willing to renounce his Egyptian citizenship and, indeed, never did.  (Def.'s App. at 32, 50.)  Because it would be time consuming to get a confirmation letter from the Egyptian embassy, Woodhouse asked Eskander to apply for a category-one position, which does not have a dual-citizenship bar.  (Def.'s App. 129, 137-38.)  However, Eskander did not pass the language test for this position.[3]  (Def.'s App. at 40, 130.)

On April 27, 2004, Eskander filed a discrimination charge with the Equal Employment Opportunity Commission, alleging that Titan had discriminated against him based on his national origin.  (Def.'s App. at 52, 98.)  Specifically, Eskander believed Titan did not hire him as a linguist because he was a dual citizen.  (Def.'s App. at 54.)  The EEOC dismissed Eskander's discrimination charge the same day he filed it because "the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  (Def.'s App. at 96.)  Woodhouse and another Titan employee contacted Eskander after the dismissal and told him that he needed to renounce his Egyptian citizenship and get written confirmation from the embassy.  (Def.'s App. at 53.)  Soon thereafter, Eskander called the Egyptian embassy and asked for the return of his passport.  (Def.'s App. at 47.)

In October 2004, Woodhouse called Eskander to remind him that his Egyptian passport had expired and to ask if he wanted to reapply for a category-two position.  (Def.'s App. at 38, 54, 117.) Because Eskander was not willing to be posted in Iraq, Woodhouse did not further pursue Eskander because there were no openings for Arab-speaking linguists outside of Iraq.  (Def.'s App. at 117-18.)

---

[3]A category-one linguist needed to be proficient in the Iraqi dialect, which Eskander was not.  (Def.'s App. at 38-39.)

On February 15, 2005, Titan's counsel sent a letter to Eskander's counsel requesting that he reapply for a category-two position, but informing Eskander that a position outside of Iraq could not be promised.  (Def.'s App. at 248.2-248.3.)  Eskander did not reapply.

On July 23, 2004, Eskander filed suit in this Court, arguing that Titan discriminated against him because of his Egyptian national origin in violation of § 1981 and Title VII.  *See* 42 U.S.C.A. §§ 1981, 2000e-2(a)(1) (West 2003).  Eskander does not raise any other basis under which Titan discriminated against him.  (Def.'s App. at 54.)  Titan moves for summary judgment.[4]

## II. STANDARDS OF REVIEW

### A. SUMMARY JUDGMENT

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party moving for summary judgment has the initial burden of demonstrating that it is entitled to a summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party need not produce evidence showing the absence of an issue of fact with respect to an issue on which the nonmovant bears the burden of proof, however.  Rather, the moving party need only point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmovant's claim.  *See id.* at 323-25.

When the moving party has carried its summary judgment burden, the nonmovant must go beyond the pleadings and by its own affidavits or by the depositions, answers to interrogatories, or admissions on file set forth specific facts showing that there is a genuine issue for trial.  FED. R. CIV.

_____

[4]For the reasons stated in Titan's reply, Eskander's objections to portions of Titan's summary-judgment evidence are overruled.

P. 56(e).  This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions or by only a scintilla of evidence.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

In making its determination on the motion, the Court must look at the full record in the case. FED. R. CIV. P. 56(c); *see Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988).  Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992).  Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim."  *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

### B. TITLE VII AND § 1981

Title VII provides that it is unlawful for an employer to fail or refuse to hire based on an individual's national origin.  42 U.S.C.A. § 2000e-2(a)(1).  Section 1981 provides that all persons shall have the same contractual rights.  42 U.S.C.A. § 1981(a).  Generally, § 1981 serves as a deterrent to employment discrimination and a way to punish employers who discriminate on the basis of race.  *Carroll v. Gen. Accident Ins. Co. of Am.*, 891 F.2d 1174, 1176 (5th Cir. 1990).  Claims of employment discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims brought under Title VII.  *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004).

Discrimination under Title VII or § 1981 can be established through either direct or

6

circumstantial evidence.  *See Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).  Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.  *See West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 (5th Cir. 2003).  If there is no direct evidence of discrimination, the plaintiff must initially establish a prima facie case by satisfying a multi-factor test from which a discriminatory motive may be inferred, which creates a rebuttable presumption of intentional discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  To establish this prima facie case, the plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for the position for which he applied, (3) he was not hired for the position that he sought, and (4) the employer persisted in interviewing and hiring applicants with qualifications comparable to those possessed by Eskander.  *See McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973); *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004).  Once the prima facie case is made, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  *See McDonnell Douglas*, 411 U.S. at 802.  The plaintiff must then show that the reason articulated by the employer was pretextual.  *See id.* at 805.

## III. DISCUSSION

First, Eskander's claim under § 1981 fails.  National-origin discrimination is not recognized under § 1981.  *See St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).  Section 1981claims are available only for discrimination based on race.  *See id.*  National origin discrimination is not racial discrimination.  *See id.* (stating that plaintiff needed to assert discrimination based on race "rather than solely on the place or nation of his origin").  In his

response, Eskander does not dispute that his § 1981 claim is not cognizable.

Eskander also has not met his burden to prove a prima facie case of discrimination under Title VII. Pursuant to Army dictates, a category-two linguist cannot possess dual citizenship. Eskander admits that he was a dual citizen; thus, he was not qualified for the category-two position for which he applied. Further, he failed to properly renounce his citizenship as required by the Army to qualify for the position. Eskander could not pass the language test for the category-one position, which did not bar dual-citizen applicants.[5] After Eskander's Egyptian passport expired and he was no longer considered a dual citizen, Eskander decided he did not want to be posted in Iraq, which was the only posting hiring category-two linguists.

There is also no evidence that Titan hired applicants with similar qualifications comparable to those possessed by Eskander. Woodhouse stated that he recruited other linguist applicants from Egypt and other foreign nations and that 99% of the applicants he recruited were born outside of the United States. (Def.'s App. at 130.) Of the 366 category-two linguists hired after January 1, 2004, through March 31, 2005, approximately 10% listed Egypt as their country of birth. (Def.'s App. at 236-243.1.) Woodhouse told other category-two applicants that they had to return their foreign passports and renounce their citizenship. (Def.'s App. at 123-24.) Woodhouse consistently communicated and applied the Army's modified renunciation requirements to other category-two applicants besides Eskander. (Def.'s App. at 130.) This evidence is undisputed, and Eskander has produced no evidence to show that other category-two linguists who were dual citizens were hired without returning their foreign passport and renouncing their foreign citizenship.

---

[5]Eskander does not complain that he was not hired for the category-one position.

## IV. CONCLUSION

Because Eskander has failed to produce any evidence to support his prima facie case of employment discrimination, Titan is entitled to summary judgment.

SIGNED May 2, 2006.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE